BCLDLe

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA )
)
v. ) Criminal No. 2:22-cr-299
) (18 U.S.C. §§ 1349, 1956(h))
CESAR JAVIER CHOURIO MORANTE ) **[UNDER SEAL]**

FILED
DEC 06 2022
CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

**INDICTMENT**

The grand jury charges:

**COUNT ONE**

At all times material to this Indictment:

THE CONSPIRACY

1. From in and around August 2021, and continuing thereafter to in and around August 2022, in the Western District of Pennsylvania and elsewhere, the defendant, CESAR JAVIER CHOURIO MORANTE, and other individuals known and unknown to the grand jury, including the individuals identified as Courier #1, Courier #2, Courier #3, Courier #4, Courier #5, Courier #6, Courier #7, Courier #8, Safehouse #1, and Safehouse #2, knowingly and willfully did conspire, combine, confederate and agree with each other to commit Wire Fraud, in violation of 18 U.S.C. § 1343.

OVERVIEW OF THE CONSPIRACY

2. The defendant, CESAR JAVIER CHOURIO MORANTE, a resident of Panama and citizen of Venezuela, conspired with others known and unknown to the grand jury, to target elderly victims in the United States with a scheme to defraud that was designed to deceive the victims into providing their money and property to members of the conspiracy based on the false pretense that it was needed as bail money for a loved-one, generally a grandchild, who was detained in connection with a legal proceeding (hereinafter, the "bond scam").

## MANNER AND MEANS OF THE CONSPIRACY

### The Bond Scam

3. It was a manner and means of the conspiracy that, to carry out the bond scam, members of the conspiracy placed telephone calls to elderly victims. During these telephone calls, a conspirator falsely informed the victim, while posing as the victim's loved-one, that they were detained as the result of a legal proceeding, that they needed money for bail, and that an attorney who had agreed to represent them would be reaching out to the victim. The victim was sometimes told that the purported legal proceeding related to a distracted driving incident, in which a car being driven by their loved-one had collided with one being driven by a pregnant woman.

4. It was a further manner and means of the conspiracy that another member of the conspiracy would thereafter speak to the victim on the telephone, while posing as an attorney representing the victim's loved-one in connection with the purported legal proceeding. The purported attorney falsely informed the victim that their loved-one needed bail money—often thousands or tens-of-thousands of dollars—in order to be released from detention, and that the bail money should be paid as cash. The purported attorney also informed the victim that there was a "gag-order" on their loved-one's case, such that the victim could not discuss it with anyone else, including any bank tellers who asked questions about the purpose of a cash withdrawal made by the victim.

5. It was a further manner and means of the conspiracy that, while posing as an attorney representing the victim's loved-one, a member of the conspiracy falsely informed the victim that they would arrange for a "courier" or "bail-bondsman" to come to the victim's residence to retrieve the bail money. In reality, these "couriers" and "bail-bondsmen" were members of the conspiracy.

6. It was a further manner and means of the conspiracy that the false representations and instructions of the purported attorney induced elderly victims in the Western District of Pennsylvania and elsewhere throughout the United States to withdraw currency from financial institutions and provide it to the members of the conspiracy posing as couriers and bondsmen. In an attempt to obtain the funds and avoid violating the purported "gag-order," some victims, acting at the direction of the purported attorney, falsely told employees of the financial institutions from which they withdrew the money that it was needed for home renovations or other purposes.

7. It was a further manner and means of the conspiracy that, in some cases, after the victim provided currency to the conspirator posing as the bail-bondman, the purported attorney again contacted the victim by telephone and falsely informed the victim that additional bail money was needed—in some cases, because the pregnant woman involved in the purported traffic accident had died or lost her baby. In these instances, the victim was instructed by the purported attorney to send additional cash, often totaling tens of thousands of dollars, by an interstate commercial carrier to an address associated with the conspiracy.

Traveling "Couriers" and "Safehouses"

8. It was a further manner and means of the conspiracy that some members of the conspiracy posed as "couriers" or "bondsmen" and collected proceeds of the bond scam directly from victims. These purported couriers provided the cash that they collected from victims to another member of the conspiracy, who was referred to as the "safehouse," "vault," or "boveda." The "safehouse" collected the money retrieved from the victims by the "couriers" and facilitated its delivery to other members of the conspiracy, including so that it might be converted to cryptocurrency and transferred abroad. The "couriers" and "safehouses" each retained a portion of the bond scam proceeds as compensation for their participation in the conspiracy.

9. It was a further part of the conspiracy that the "couriers" used rental cars to drive to victims' residences, collect currency from them, and deliver it to the "safehouse." In turn, the "safehouse" used hotel rooms to collect and store proceeds of the bond scam. The "safehouse" was also responsible for tracking the amount of money collected by the "couriers," the expenses that they incurred as a result of their travels, and the compensation owed to the various members of the conspiracy.

10. It was a further part of the conspiracy that groups of "couriers" and "safehouses" traveled to locations across the United States, including the Western District of Pennsylvania, in order to execute the bond scam and collect its proceeds. Specifically, as part of the bond scam:

a. In and around August 2021, the co-conspirator identified as Courier #1 traveled to Idaho in order to collect money from victims of the bond scam;

b. In and around September 2021, the co-conspirator identified as Courier #2 traveled to Georgia in order to collect money from victims of the bond scam;

c. In and around September 2021, the co-conspirator identified as Courier #3 traveled to New Hampshire in order to collect money from victims of the bond scam, and to New York City in order to deliver proceeds of the bond scam to another member of the conspiracy;

d. In and around September 2021, the co-conspirators identified as Safehouse #1, Courier #3, and Courier #4 traveled to the Western District of Pennsylvania in order to collect money from victims of the bond scam;

e. In and around December 2021, the co-conspirators identified as Safehouse #2 and Courier #5 traveled to New York in order to collect money from victims of the bond scam, and Safehouse #2 traveled to New York City in in order to deliver proceeds of the bond scam to another member of the conspiracy;

f. In and around February 2022, the co-conspirators identified as Safehouse #2, Courier #5, and Courier #6, traveled to Georgia, the Western District of Pennsylvania, and Tennessee in order to collect money from victims of the bond scam, and Safehouse #2 traveled to New York City to deliver proceeds of the bond scam to another member of the conspiracy;

g. In and around March 2022, the co-conspirators identified as Safehouse #2, Courier #5, and Courier #7 traveled to Georgia in order to collect money from victims of the bond scam; and,

h. In and around August 2022, the co-conspirator identified as Courier #8 traveled to Kansas to collect money from victims of the bond scam.

Leadership Organization in Panama

11. It was a further manner and means of the conspiracy that members of the conspiracy operating from Panama and other locations abroad, including the defendant, CESAR JAVIER CHOURIO MORANTE, organized, coordinated, and directed the activities of the "couriers" and "safehouses," who were executing the bond scam in the United States.

12. It was a further manner and means of the conspiracy that members of the conspiracy, including the defendant, CESAR JAVIER CHOURIO MORANTE, directed the "couriers" and "safehouses" to travel to specific geographic areas in furtherance of the bond scam and arranged for flights and hotel reservations to facilitate that travel.

13. It was a further manner and means of the conspiracy that members of the conspiracy, including the defendant, CESAR JAVIER CHOURIO MORANTE, sent the names and addresses of bond scam victims to the "couriers" who had been assigned to collect money from them.

14. It was a further manner and means of the conspiracy that members of the conspiracy provided the "couriers" and "safehouses" with directions about how to avoid detection when collecting cash from victims of the bond scam. These directions included instructions to, among other things, drive past the victim's residence and note any vehicles present there; park several blocks from the victim's residence; avoid letting the victim or other individuals see the rental vehicles or their license plates; check the area of a victim's residence for security cameras; wait to receive a "green light" from a member of the conspiracy before approaching a victim's residence; wear a mask and hat; and use an alias assigned by a member of the conspiracy when dealing with victims.

15. It was a further manner and means of the conspiracy that members of the conspiracy, including the defendant, CESAR JAVIER CHOURIO MORANTE, instructed the "couriers" and "safehouses" to transfer bond scam proceeds to others, by methods including in-person deliveries of bulk cash, Western Union transfers, and conversion to cryptocurrency, in part as manner to conceal the origin of such funds.

16. It was a further manner and means of the conspiracy that members of the conspiracy, including the defendant, CESAR JAVIER CHOURIO MORANTE, communicated with one another and with bond scam victims via telephone calls and messages, including many transmitted through the encrypted messaging applications Signal and WhatsApp. These telephone calls and messages were transmitted in interstate and foreign commerce by means of wire communications.

17. It was a further manner and means of the conspiracy that members of the conspiracy, acting at the direction of the defendant, CESAR JAVIER CHOURIO MORANTE,

and others, fraudulently induced victims of the bond scam to provide approximately $1,500,000 to members of the conspiracy.

In violation of Title 18, United States Code, Section 1349.

**COUNT TWO**

The grand jury further charges:

18. Paragraphs 1 through 17 are incorporated as if fully set forth herein.

19. From in and around August 2021, continuing thereafter to in and around August 2022, in the Western District of Pennsylvania and elsewhere, the defendant, CESAR JAVIER CHOURIO MORANTE, did knowingly, intentionally, and unlawfully conspire with persons both known and unknown to the grand jury, including the individuals identified as Courier #1, Courier #2, Courier #3, Courier #4, Courier #5, Courier #6, Courier #7, Courier #8, Safehouse #1, and Safehouse #2, to commit an offense against the United States in violation of Title 18, United States Code, Section 1956(a)(2)(B), to wit: to transmit and transfer, and cause to be transmitted and transferred, monetary instruments and funds from a place in the United States to and through a place outside the United States, knowing that the monetary instruments and funds involved in the transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transmission and transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.

In violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS

20. Paragraphs 1 through 19 of this Indictment are hereby re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging criminal forfeiture.

21. The United States hereby gives notice to the defendant charged in Count One that, upon conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of such offense, including but not limited to the following:

a. Approximately $245,920.60 in United States currency seized from Courier #3 and Safehouse #1 on or about September 30, 2021, in Pittsburgh, Pennsylvania;

b. Approximately $5,035, seized from JP Morgan Chase Bank Account ending in 1316;

c. Approximately $2,961.26 seized from TD Bank Account ending in 3401;

d. Approximately $18,000 in United States currency seized from Courier #6 on or about February 28, 2022, in Walton County, Georgia; and

e. A sum of money in an amount of approximately $1,500,000;

22. The United States hereby gives notice to the defendant charged in Count Two that, upon conviction of such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), of all property involved in each offense of conviction in violation of Title 18, United States Code, Section 1956, or conspiracy to commit such offense, and all property traceable to such property, including but not limited to the following:

a. A sum of money in an amount of approximately $1,500,000.

23. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of such defendant up to the value of the forfeitable property described in this forfeiture allegation.

A True Bill,

FOREPERSON

CINDY K. CHUNG
United States Attorney
PA ID No. 317227

JEFFREY R. BENGEL
Assistant United States Attorney
DC ID No. 1018621